UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------- X

QUINCY NANG, M.D., M.P.H.,                          :     **COMPLAINT**
                                                    :
                          Plaintiff,                :     Civil Action No.:
                                                    :
                                                    :
             -against-                              :
                                                    :     **JURY TRIAL DEMANDED**
                                                    :
                                                    :
NEW YORK-PRESBYTERIAN HOSPITAL,                     :
                                                    :
                          Defendant.                :
----------------------------------------------------------------- X

QUINCY NANG, M.D., M.P.H., by his attorneys, Markus & Sheridan, LLP, as and for his Complaint, alleges upon information and belief as follows:

**PARTIES AND NATURE OF THE CASE**

1.     Plaintiff, Quincy Nang, M.D., M.P.H. ("Plaintiff" or Dr. Nang) was employed by Defendant New York-Presbyterian ("NYP") as a resident in the Urology Department.

2.     NYP is a public institution of higher learning located in New York, New York. NYP receives substantial federal funding.

3.     NYP employed and still employs more than twenty employees in the current or proceeding calendar year.

4.     Dr. Nang, a Black African gay man is a member of several protected classes.

5.     At all relevant times herein, Dr. Nang had a cognitive disability and/or was regarded as having a disability by Defendant NYP and therefore is a member of a protected class. Specifically, Dr. Nang suffers from Attention Deficient Hyperactivity Disorder (ADHD), also

commonly referred to as "Executive Function Disorder." This cognitive disability substantially limits his major life activities, including but not limited to reading, concentrating, thinking, communicating, and working.

6.     Upon information and belief, individuals with ADHD are resilient, energetic, passionate, creative, and tend to be especially hyper-focused (which can inhibit progressive thinking and the ability to plan forward in a baseline setting without support). The person with ADHD although having substantive knowledge and requisite skill, without the correct prompting and coaching, may appear to lack the knowledge or skill, when it is not the case. In other words, different does not mean less. By way of example, in the workplace accommodating an individual with ADHD by providing extra time to complete tasks, or answer questions, and the opportunity to ask the same questions in different ways during teaching is a reasonable accommodation and can assist the ADHD individual in complying with the essential functions of the job.  As demonstrated herein, NYP clearly lacked understanding regarding Dr. Nang's ADHD disability.

7.     At all relevant times herein, Dr. Nang was qualified to perform and willing to perform all the functions of his residency training program despite the existence of his cognitive disability.

8.     This is an action for equitable relief and monetary damages to redress Defendants' unlawful employment discrimination against Dr. Nang based upon his cognitive disability, sexual orientation, and race/color, and to remedy retaliation against him pursuant to the Rehabilitation Act of 1973 (29 U.S.C. §701 *et seq.*), 42 U.S.C. §1981, the New York State Human Rights Law (NYSHRL), N.Y. Executive Law Article 15 §§ 290 *et seq.*, and the New York City Human Rights Law (NYCHRL), New York City Administrative Code, Chapter 1, Title 8, §8-107 *et seq.*

9.    Specifically, during his employment at NYP, Dr. Nang was discriminated against because of his cognitive disability, sexual orientation, and race/color in the terms and conditions of his employment within the NYP medical residency program.  NYP also refused to engage in an interactive dialogue to determine the feasibility of his requested reasonable accommodations once Dr. Nang identified his disability.  Moreover, failed to follow ACGME guidance and its policies concerning Dr. Nang's continuation in the residency program, supported a work environment permeated with discriminatory intimidation, and terminated his residency while allowing similarly situated heterosexual White males and/or non-disabled colleagues to remain in the residency program.

## JURISDICTION

10.    Jurisdiction in this Court arises under 28 U.S.C. §1331.  Supplemental jurisdiction is also confirmed on this Court pursuant to 28 U.S.C. §1367.  Plaintiff respectfully requests this Court to exercise jurisdiction over his pendant state and city law claims.

11.    Injunctive and declaratory relief, damages, and other appropriate legal and equitable relief, including but not limited to Dr. Nang's return to his fifth post-graduate year in the NYP urology residency program pursuant to the Rehabilitation Act of 1973, 42 U.S.C. §1981, the NYSHRL, and the NYCHRL.

## SATISFACTION OF PRE-SUIT REQUIREMENTS

12.    Plaintiff has complied fully with all prerequisites for jurisdiction in this Court.

13.    Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission in connection with this matter for race/color, sexual orientation, and disability discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") as amended 42 U.S.C. §§ 2000e, et seq., and the Americans with Disabilities Act of 1990, 42 U.S.C. §12101

*et seq.*, as amended by the ADA Amendments Act of 2008, Pub. L. 110-305 (collectively the "ADA"). Once a Notice of Right to Sue has been received, Plaintiff will seek to file an amended complaint adding these additional claims.

## VENUE

14.     The unlawful employment practices alleged below were committed within New York, New York, and Defendant NYP resides in this judicial district. Accordingly, venue lies in the United States District Court for the Southern District of New York under 28 U.S.C. § 1391 (b), (c), and (d).

## STATEMENT OF FACTS

15.     Dr. Nang is someone who has fought against adversity throughout his life to succeed against all odds. He is the epitome of resilience. Born in Gabon, Central Africa, at the age of one years old, his family moved to France. Due to his ailing grandmother, Dr. Nang and his family returned to Gabon when he was just 12 years old. Despite enduring significant hardships during his formative childhood years, including unsanitary conditions, lack of running water, and absence of public infrastructure, Dr. Nang's mother pressed on, using her savings to place him and his siblings in good schools.

16.     Emulating his mother's drive, Dr. Nang pushed to better his circumstances, achieving top marks in his schooling which allowed him to join a semi-private junior high school and one of the most academically rigorous high schools in Gabon. Near the end of his secondary education, Dr. Nang won a national intercollege essay contest organized by the U.S. Embassy, and with his exceptional performances in the sciences, Dr. Nang qualified for an international Gabonese scholarship. Dr. Nang subsequently applied for and was accepted at Saint Cloud State University in Minnesota but had to "collect" funds from family members to apply for a visa to the

United States. Making the difficult decision to leave his mother and siblings in Gabon, a few months after his eighteenth birthday, Dr. Nang got on his first ever flight to the United States. This, unfortunately, would be the last time he saw his mother.

17.     Nearly thirteen months after arriving in the United States, Dr. Nang received a call that his mother had passed on the operating table in Gabon. Dr. Nang's mother had developed uterine fibroid complications, and without adequate available surgical intervention, she did not survive. Dr. Nang had no choice but to remain in Minnesota and focus on his studies.

18.     Achieving a college-level proficiency of a foreign language in a matter of eight months paled in comparison to adjusting to life alone in Minnesota, but Dr. Nang threw himself behind his studies. Saint Cloud University offered Dr. Nang invaluable experiences and clarity, both personally and professionally, including the revelation of his own sexuality as a gay man, which unearthed a passion for HIV advocacy, and the intersection of human rights, poverty, and global health. For Dr. Nang, medicine offered the perfect bridge between these topics and his scientific pursuits. Consistent with that passion for helping others, during his undergraduate years, Dr. Nang interned for the United National Development Program's HIV/AIDS Regional Program for the Arab States (UNDP's HARPAS) in Cairo, Egypt and, under the auspices of the Student Board of Directors of the US division of Sodexo (a 13-billion USD multinational company), chaired a national committee responsible for the development and implementation of campus activities to tackle hunger in the United States, among other leadership positions in various organizations. To help support himself financially, Dr. Nang also worked as a campus public safety department officer on overnight shifts all while maintaining a rigorous academic schedule.

19.     Graduating Valedictorian with honors in chemistry and a minor in biochemistry in 2009, Dr. Nang applied to several medical schools. He was accepted to the University of Minnesota

Medical School but decided to decline his admission to gain practical work experience. Dr. Nang secured a job as a Clinical Research Coordinator at Boston Children's Hospital ("BCS") that required a two-year commitment. At BCS, Dr. Nang co-founded and developed a training program for research assistants and co-authored a peer-reviewed publication on a novel service-oriented professional development program in the *Journal of Medical Education*, among other endeavors. Boston also proved to be a time of personal growth for Dr. Nang, allowing him to be open with his sexual orientation and eventually meeting his husband.

20.     In late 2012, Dr. Nang applied to and matriculated to the Mayo Medical School. During his attendance at Mayo Medical School, Dr. Nang's mother's passing served as a beacon to pursue surgical knowledge, in particular, urology, with a focus on bringing surgical excellence to Gabon.

21.     In line with this goal, in between his third and fourth year at the Mayo Medical School, Dr. Nang also sought a master's degree in Global Public Health from Harvard and was awarded a degree in June 2017 (only the third Gabonese person ever to receive a Harvard diploma at that time). Dr. Nang served as a teaching assistant and tutor for Mayo Medical School's first-year Histology course and for the Mayo School of Health Sciences Surgical First Assistant Program in Gross Anatomy. Among other leadership experiences at Harvard, Dr. Nang was commissioned by both the Harvard T.H. Chan School of Public Health and by a surgical initiative of Harvard Medical School to travel to Cape Verde, Africa to evaluate surgical care delivery processes and opportunities for improvement with the Program for Global Surgery and Social Change.

22.     After returning to medical school, Dr. Nang designated his last clerkship at the Mayo Clinic in the urology department, adding a month-long urology sub-internship. His

recommendation letters from the Department of Urology at the Mayo Clinic, and evaluations from the Mayo School of Medicine reflected an exceptional knowledge base, surgical skills beyond his training, and a recommendation that he would succeed as a urologist without comprising the ability to provide compassionate care to his patients.

23.     In or about November 2016, Dr. Nang applied for the Mayo Clinic and NYP's Urology Residency Programs. Undecided on his rankings, NYP's then program director Dr. Richard Lee, told Dr. Nang that NYP's residency program adhered to duty hour limits for residents and assured him that the program was "like a family."  Both statements proved to be false.

24.     Relying on the NYP's program director's representations, Dr. Nang revised his ranking to favor NYP and was accepted to the Urology residency training program at New York-Presbyterian/Weill Cornell Medical Center (the "Program") in or about June 2017 under Dr. Richard Lee, Program Director. Upon information and belief, Dr. Nang was the first Black male admitted to the Program.    For each post-graduate year ("PGY") during his residency, Dr. Nang and NYP entered into a "Graduate Staff Member Agreement of Appointment and Employment for the Academic Year" which generally began on July 1st and ended on June 30th of the following calendar year (*e.g.*, July 1, 2017 to June 30, 2018).

25.     Dr. Nang was a General Surgery intern for his PGY-1. During his internship, Dr. Nang was taught how to enter the abdomen, robotic surgery docking basics, and bedside assist procedures, as well as instruction on tying knots and closing skin. Dr. Nang also spent two months on urological rotations, most of the day in the operating room of the cystoscopy suite conducting endoscopic cases.  There was never a concern expressed about his surgical skills.

26.     Nevertheless, surgery is an apprenticeship and its success in developing skills knowledge for the trainee is dependent subjectively on the trainer's willingness to impart that

knowledge and develop a solid rapport. In Dr. Lee's case, Dr. Nang did not "fit the mold" as the only Black African gay man in the NYP subspecialty, and he alienated Dr. Nang from the outset.

27.    By way of example, Dr. Lee would ask other male residents in Dr. Nang's presence about their girlfriends or romantic interactions with female hospital staff, and speak to them about male American sport teams, knowing that Dr. Nang was gay, foreign born, and could not contribute to the discussion.

28.    Dr. Lee's disparate treatment of Dr. Nang did not end there.  Notably, during his PGY-1, Dr. Nang was to spend two months on a urological rotation.  During an operation in the cystoscopy suite, Dr. Lee began yelling at Dr. Nang, attempting to unnerve him.  As a result, Dr. Nang dropped a guidewire on the floor, and Dr. Lee continued to berate him without foundation, eventually requiring the nurses to intervene and remind Dr. Lee that he had dropped plenty of wires while a resident.

29.    Dr. Nang successfully completed PGY-1 and received a certificate from the NYP the General Surgery department highlighting that he had met the required surgical and clinical skills targets.

30.    Dr. Nang's PGY-2 began with a three-month rotation at NYP Queens where he was able to spend additional time in the operating room ("OR") and gained confidence working independently.  Dr. Nang was recognized for his skill development, even being asked by at least two seasoned urology attendings to perform maneuvers during particularly difficult endoscopic cases.  Indeed, by the time Dr. Nang left NYP Queens, the nursing OR staff and Postop Acute Care Unit ("PACU") sent a letter to the NYP Queens Urology Chair (Dr. Gerry Wang), commending Dr. Nang for his knowledge, bedside manner, skill set, and professional conduct.

31.    Dr. Nang completed his second mandatory PGY-2 rotation at Memorial Sloan

Kettering Cancer Center. While there, he was exposed to a variety of open cases in addition to the usual cystoscopy procedures. Dr. Nang spent considerable time with Dr. Russo, a kidney surgeon and an administrative fellow, Dr. Matulewitz, both of whom were incredibly open to teaching him, which translated into Dr. Nang actively participating in a variety of open renal cases.

32.    In addition to his two "away" rotations, Dr. Nang completed one of the two required months on the Surgical Intensive Care Unit ("SICU"), tasked with the management of critically ill patients. Dr. Nang began his first urology rotation at the Weill Cornell Medicine Center ("Cornell Campus") following his SICU rotation and began operating again under Dr Lee's tutelage. Unfortunately, upon his return to the Cornell campus, the disparate treatment towards him resumed.

33.    For instance, one day, in the cystoscopy suite, Dr. Lee resumed his "teaching style" by yelling at Dr. Nang while operating, that directly led him to losing control of a ureteral stent (*i.e.*, the stent end goes up to the ureter) during an endoscopic procedure – a procedure that he had performed alone countless number of times. This incident is referred to as "floating a stent" and is a common occurrence by residents in training. In this case, the stent had migrated just out of reach of the regular instruments, requiring Dr. Nang to use additional ureteroscopy equipment. Nevertheless, Dr. Lee kept yelling at Dr. Nang seeking justification for why the incident had occurred to which Dr. Nang responded with frustration that he was being screamed at continuously during an operation. Adding insult to injury, Dr. Lee directed the Chief Resident after the surgery to tell Dr. Nang that if he was not happy at NYP, he should consider looking somewhere else. Notably, there was an instance during Dr. Nang's residency where another resident allowed the entire stent to travel into the kidney requiring intervention without any repercussion.

34.    During Dr. Nang's six-month review with Dr. Lee, he was told to improve his

efficiency and speed with consultations.  Nothing was directed at his surgical skills.

35.    Dr. Lee noted in Nang's PGY-2 annual review that Dr. Nang had improved in his performance, but still needed to remain "efficient".  Dr. Nang requested more opportunities to observe faculty. Again, nothing was mentioned about his surgical skills.

36.    During Dr. Nang's PGY-3, the disparate treatment began to get progressively worse.  This residency class was the first class of four residents (usually three). Dr. Nang's co-residents included Patrick Lewicki, a heterosexual White male; Spyridon Basourakos ("Spyros"), a heterosexual Greek national, and Parwiz Abrahimi, ("Parwiz") a heterosexual Afghan American.

37.    By way of background, during Dr. Nang's PGY-3, PGY-3 residents tended to "run the service" in the Program.  This required residents to be on call for 24 hours every three to four days on average. Not only did the PGY-3 residents operate during the day, but they oversaw the physician assistants ("PAs") who were provided with notice of both inpatient status changes and new consultations.  PGY-3 residents would assess all emergency room consultations and inform the chief-on-call as needed. They also maintained the list of all the patients on the Urology service that contained summaries of recent clinical information, relevant imaging, medications, etc. The attendings who finished operating provided the on-call PGY-3 with relevant background information from their chart to update the list.  Afterwards, the chief would do evening rounds with the on-call PGY-3 and provide overnight guidance and contingency plans. It was customary for the on-call PGY-3 to control whether co-residents and junior residents could leave for the day.

38.    Often, there was an overnight PA who carried the main pager to keep the on-call PGY-3 apprised of developments. Some nights were busier than others. Typically, on a Monday night (when the surgeons who operated generally sent their patients home), the on-call PGY-3 would have a concise list to deal with consults overnight only. The on-call PGY-3 would send an

email to all the residents on service with summaries of all the patients in-house and the morning rounding patient assignments. By the early morning, the on-call PGY-3 would update the list with overnight changes and/or new admissions. All the residents were required to have seen their patients and put in their daily updated notes in the electronic medical record system ("EMR") by the time the chief returned in the morning (around 6:45 AM) and then verbally listen to updates on all the patients. (This is known as "running the list" or "table round").

39.    During table rounds at the outset of his PGY-3, Dr. Nang's co-residents began to harass him.  As the only Black gay male, they would continually taunt him by highlighting typographical errors and purposely ask him rhetorical questions in a mocking fashion. Upon information and belief, NYP supported such unlawful conduct.

40.    NYP also created a culture for the Program in which post-call residents were expected to violate duty hours by staying beyond their 24-hour shift. During his PGY-3, Dr. Nang tended to have more consultations than his peers and/or treated patients with greater maladies. Usually by the morning shift, Dr. Nang was physically and mentally exhausted, and instead of violating duty hours, he needed to sleep. Nevertheless, at times, NYP required him to "unofficially" violate duty hours and "show his face" in the OR post-call, which upon information and belief, were never reported to ACGME.  For Dr. Nang, his continual lack of sleep and physical exhaustion exacerbated his undiagnosed ADHD.  Moreover, as a Black man, NYP supervisory staff began to treat Dr. Nang negatively and disparately based on his failure to violate duty hours. Upon information and belief, a female Black peer who equally refused to violate duty hours confirmed with him that she too was a target of similar unlawful conduct.

41.    The unlawful conduct increased under the second chief during Dr. Nang's PGY-3. At one point, Parwiz started openly taking pictures of Dr. Nang during shifts and sharing them

with his co-residents either making fun of him or turning Dr. Nang into a meme.  Emboldened by Parwiz's unlawful conduct, his co-residents began to openly make Dr. Nang the subject of jokes with the chief, which resulted in the chief assigning Dr. Nang fewer desirable cases and giving his co-residents preferential treatment.

42.    Dr. Lee, for his part, began to favor the other heterosexual male residents too, and returned to screaming at Dr. Nang without justification. By way of example, during an evening shift, Dr. Nang called Dr. Lee about a patient who had come to the emergency room with a stone in her urinary tract. At best the patient had questionable laboratory signs of a concurrent urinary tract infection but no evidence of any clinical deterioration despite several hours of observations. Dr. Lee told Dr. Nang to monitor the patient until the morning before sending her to the OR.  In the morning, however, Dr. Lee screamed at Dr. Nang for not sending the patient to the OR overnight, and that he needed to send her to the OR immediately. After his post-call, however, Dr. Nang checked the record and noticed that while Dr. Lee could have changed his schedule around to expedite this patient's OR treatment, he chose not to operate on them until the late evening.  The patient had no complications.

43.    In or about late June 2020, Dr. Nang told Parwiz to stop harassing him (implicitly based on his race) in the middle of the resident room and in front of the PA's and other co-residents, or he would report him to NYP's human resources department.  Dr. Lee subsequently called Dr. Nang and started yelling at Dr. Nang for threatening to go to human resources, remarking to him that reporting Parwiz to human resources would be detrimental to Parwiz's career. Dr. Lee also stated that because Parwiz was shorter than Nang, he could not bully him, and condescendingly asked him if he needed "daddy" to come down and fix the issue.  From that point on, Dr. Lee no longer acknowledged Dr. Nang in front of the co-residents unless it was clinically or

administratively related.

44.    During this period, Covid was in full bloom and only the PGY-3's were left on the Urology service.  Dr. Nang frequently worked 100-hour weeks during this period.

45.    Dr. Lee reported to Dr. Nang at his year-end review that he was meeting expectations, including in surgical skills.

46.    Dr. Nang's PGY-4 was dedicated to research.  Dr. Nang had joined the Program with the intent of using his research to continue his work on global health work.  At the time, the only physicians conducting global health research were Drs. Lee and Phillip Li, specifically a clinical trial in Africa for a circumcision ring to facilitate neonatal circumcision as an HIV protection initiative. Given Covid restrictions, Dr. Li could not facilitate the usual microsurgery course on animal models, however, he was able to supervise Dr. Nang on microsurgical fundamentals.  Dr. Li informed Dr. Nang that he had taken a video of Dr. Nang's hands while conducting these techniques and had subsequently told Dr. Lee via telephone that "Quincy has great hands" (referring to his surgical skills).

47.    As part of the research, Dr. Lee had Dr. Nang work on a manuscript.  This was the first manuscript Dr. Nang had written from scratch and he spent hours compiling the research. After he submitted it to Dr. Lee for comment, Dr. Lee asked Spyros to shorten it and resubmit it to the faculty for comment.  Dr. Lee remarked to Dr. Nang "you went to Harvard. I expected your paper to not need any modifications and to be perfect.  Instead, it was shit." Dr. Lee subsequently allowed Spyros to claim First Authorship on the manuscript during his PGY-5.

48.    Due to continued Covid restrictions during Dr. Nang's PGY-4, he and the other residents did not take the in-service exam ("ISE").  Dr. Nang also used his PGY-4 to seek support from the NYP's Work Health and Safety office ("WHS"). Dr. Nang was referred by WHS to a

psychiatrist who provided him with a diagnosis of ADHD and placed him on a high dose of stimulant, which at times would cause him to shake. Dr. Nang was also introduced to his treating neuropsychologist/therapist for additional support.

49.    On or about June 15, 2021, Dr. Nang began his first PGY-5 rotation in pediatric urology (three months in pediatrics rotation and approximately 1 ½ months of ambulatory pediatrics). As the pediatric chief, he was scheduled for an 11-hour shift Monday through Friday with on-call ability 24 hours/day. At this point, Dr. Nang and his treating physicians had not established an ideal regimen for his ADHD in a clinical setting.

50.    Unfortunately, as Dr. Nang and his treating psychiatrist worked to establish this regimen, Dr. Nang's father's health began to seriously decline. These factors led to several minor administrative issues– none of which related to patient management or surgical skills. For example, Dr. Nang forgot to write a note for one of his consults in the NICU (although he had taken additional time to speak to the team and returned to the hospital after getting home to speak with the parent), his co-presenter failed to schedule a conference, and he calendared the wrong date resulting in the conference being rescheduled.

51.    By September 2021, Dr. Nang was not afforded time to see his providers during clinical hours, serving as a chief of the pediatric urology service, and put under significant stress with his father's health deteriorating. This resulted in a vasovagal incident in his apartment in which he fell and likely tore his shoulder, while still managing not to miss a day of work.

52.    On October 10, 2021, Dr. Nang's father passed away in Gabon, Africa, leaving Dr. Nang responsible for (financially and otherwise) over ten siblings, and financial support for his paternal uncle who was incarcerated here in the United States.

53.    On or about November 15, 2021, Dr. Nang was called into an early morning

meeting by Dr. Lee.  When he arrived, Dr. Lee told him that he needed to meet with NYP's Work Health and Safety office and that he would accompany him to the office.  When they arrived, Dr. Nang was called in by the nurse practitioner, told that he was being put on administrative leave, and that he needed to provide a urine sample and have blood drawn as part of a drug test (which of course was negative).   Upon information and belief, no other resident was subjected to such testing.

54.     During his administrative leave, Dr. Nang continued to seek treatment for his ADHD with his treating psychiatrist and therapist.

55.     On or about May 30, 2022, Dr. Nang returned to the Program.  Upon rejoining the Program, Dr. Nang spoke with Dr. Larissa Rodríguez, the new chair of the NYP-WCMC Department of Urology, who asked if he would still need time off for psychiatric treatment and therapy during clinical hours.  Dr. Rodriguez expressed relief when he said that he would not, rather he would need an hour per month to see his treating psychiatrist during regular business hours and would schedule his therapist around his clinical hours.

56.     On or about August 17, 2022, NYP's Human Resources Department and Dr. Lee informed Dr. Nang that he needed to repeat his PGY-5 and placed him on a Period of Intensive Academic Focus ("PIAF"). The initial PIAF was scheduled to begin on August 17, 2022, for a period of four months, but was later changed on September 20, 2022, to a three-month period ending December 31, 2022) ("the First PIAF").  When specifically asked whether the PIAF was a period of "probation", Dr. Jennifer DiPace, M.D., NYP's Designated Institutional Official, explained that the PIAF was not a probationary measure, but rather a "tool" to make sure Dr. Nang did not "fall through the cracks" by providing him with bi-weekly feedback from faculty after his forced administrative leave. The document presented to him, however, clearly placed Dr. Nang on

probation, noting that he would be subject to a written performance evaluation and subject to termination if his performance did not progress to the "expected level of performance by a PGY-5 resident in the Urology Residency Training Program" during the PIAF period.

57.    According to the First PIAF, Dr. Nang was deficient in his ACGME core competencies, specifically patient care and procedural skills, and that his surgical skills were below expectations for a PGY-5 urology resident, including "basic tissue handling, basic suturing and knot-tying skills, bedside assistance, and use of the robotic console."  The September 2022 PIAF highlighted that since May 30, 2022, Dr. Nang had participated in surgical skills refresher with Drs. Dix Poppas, Jim Hu, and Phillip Li where his surgical skills regarding suture tying, microsurgery, and robotic simulation were evaluated.  (In reality, Dr. Nang was offered little guidance during this period and had in fact not once met with Dr. Hu in a surgical skill context.)  As a result, under the First PIAF, Dr. Nang was being required, in addition to working full time in his Inpatient Urology rotation at NYP Cornell campus, 100 suture ties per week, 100 microsurgery procedures per week, and 2 hours of robotic simulation – benchmarks that were clearly not possible for Dr. Nang or any other of his peers. In addition, the First PIAF detailed that he needed to answer all phone calls, pages, and text messages within one hour (unless scrubbed into a case), be punctual to scheduled clinical and educational, meet weekly for direct feedback with either Drs. Lee, Davaluri, or Winkler, and then be reevaluated prior to the end of the PIAF.  Upon information and belief, no other resident was placed on a PIAF after taking an extended administrative leave and/or with these performance hurdles.

58.    In or about the Fall 2022, in direct contravention to the alleged purpose of the First PIAF, per Spyros' own admission, Dr. Hu directed Spyros, now a Chief Resident, to only schedule Dr. Nang with him on the days he was operating (and not other surgeons) but would not let Dr.

Nang participate in the robotic console operations to develop his technical and surgical skills. Spyros specifically told Dr. Nang that if he tried to place Dr. Nang with another surgeon, he would get in trouble.  Dr. Hu repeatedly engaged in further disparate conduct towards Dr. Nang during surgeries as compared to other residents. By way of example, Dr. Hu purposely interrupted Dr. Nang unnecessarily while he was tying surgical knots to prevent Dr. Nang from concentrating and/or improving his knot tying.  Dr. Hu's treatment became so abhorrent that during a surgical intervention, without medical necessity, he poked holes around a surgical knot that Dr. Nang had properly performed to create the appearance that Dr. Nang could not tie a knot and would later cite it as a performance deficiency.  Further showing his distaste to Dr. Nang and other minorities, Dr. Hu made disparaging comments to a fellow regarding allowing affirmative action in medical residencies in Dr. Nang's presence (implicitly referring to Dr. Nang's race/color).  Given such discriminatory conduct, Dr. Nang's peers repeatedly apologized to Dr. Nang for Dr. Hu's unlawful conduct.  Nevertheless, NYP continued to condone this discriminatory conduct towards Dr. Nang.

59.    On or about January 6, 2023, Dr. Lee met with Dr. Nang to discuss his performance under the September 2022 PIAF and detailed that the Clinical Competency Committee ("CCC") had ongoing concerns.  Dr. Lee noted that the CCC determined that Dr. Nang had improved sufficiently regarding the Professionalism targets outlined in the September 2022 PIAF, and that his clinical judgment skills were satisfactory for the level of training. According to Dr. Lee, however, he did not deem that his surgical skills had progressed as expected for his level of training.  The CCC was therefore going to provide him with an additional 3-month PIAF.

60.    Dr. Lee offered Dr. Nang several options.  First, he could accept the additional 3-month PIAF. Second, he could matriculate to another urology residency program at a PGY level that was both available and at a skill set the Dr. Lee would recommend.  Third, he could resign

from the Program and pursue an alternative field of medicine and/or specialty at NYP. Fourth, resign and abandon medicine altogether. Lastly, he could resign and pursue something out of healthcare temporarily, with verification from Dr. Lee or the current Program Director, the number of years Dr. Nang had successfully completed as a resident at NYP.

61.    On or about January 17, 2023, Dr. Nang wrote to Dr. Lee and the Program leadership that he would continue in the Program, but that the goal posts were being moved for him and based on the recommendations from his treating neuropsychologist/therapist, Jeanette Wasserstein in collaboration with NYP's Work Health and Safety, he would need to have accommodations put in place to continue with his residency training.

62.    On February 27, 2023, Dr. Lee responded to Dr. Nang's January 17, 2023 letter. In his response, Dr. Lee outlined the following:

> The goals set forth in the previous and any future PIAFs are designed to be in line with Urology Milestones set forth by the ACGME (https://www.acgme.org/globalassets/pdfs/milestones/urologymilestones.pdf.) All domains of competency, including your professional skill level, are assessed using this nationally accepted evaluation standard.  The technical skill and all other domains of your clinical performance must meet the minimum designated by the ACGME as outlined in the Urology Milestones, as they would for any other PGY5 resident.  No new 'goal post' was or has ever been defined for you.

63.    According to the ACGME Urology Milestones, however:

> The narrative descriptions are targets for resident performance throughout their educational program… Milestones are arranged into levels.  Tracking from Level 1 to Level 5 is synonymous with moving from novice to expert resident in the specialty or subspeciality… These levels *do not* correspond with post-graduate year of education… Residents may also regress in achievement of their milestones… for many reasons… [such as] a disjointed experience in a particular procedure…

> Level 4 is designed as a graduation goal but does not represent a graduation requirement. Making decisions about readiness for graduation and unsupervised practice is the purview of the program director. Furthermore, Milestones 2.0 includes revisions and changes that preclude using

Milestones as a sole assessment in high-stakes decisions (i.e., determination of eligibility for certification or credentialing). Level 5 is designed to represent an expert resident whose achievements in a subcompetency are greater than the expectation. Milestones are primarily designed for formative, developmental purposes to support continuous quality improvement for individual learners, education programs, and the specialty. The ACGME and its partners will continue to evaluate and perform research on the Milestones to assess their impact and value.

Examples are provided for some milestones within this document. Please note: the examples are not the required element or outcome; they are provided as a way to share the intent of the element.

Some milestone descriptions include statements about performing independently. These activities must occur in conformity to ACGME supervision guidelines as described in the Program Requirements, as well as to institutional and program policies. For example, a resident who performs a procedure independently must, at a minimum, be supervised through oversight.

Thus, the ability for Dr. Nang to meet ACGME milestones was dependent on feedback, adequate support, and supervision to work independently. Dr. Hu's not allowing Dr. Nang to perform robotic console surgeries was not consistent with Dr. Nang's development in reaching ACGME targets.

64. On February 27, 2023, Dr. Nang was provided with a second PIAF ending on May 27, 2023 (the "Second PIAF") which was a "continuation of the last PIAF which concluded on December 20, 2022". According to the Second PIAF, NYP deemed that Dr. Nang's surgical skills remained "well below expectations for a PGY-5 urology resident, including but not limited to basic tissue handling, basic suturing, and knot-tying skills, bedside assistance, and use of the robotic console. These skills are typically achieved by the PGY-3 level in a urology program." The Second PIAF also identified certain deficits, including but not limited to not being able to complete the one hundred knots per week in microsurgery or the two hours in the robotic console simulation (which again was not applied to similarly situated residents). This was surprising to Dr. Nang

because Dr. Lee had not raised these issues when he met Dr. Nang to discuss his progress during the term of the First PIAF.  Indeed, when Dr. Nang specifically asked about any remaining issues, Dr. Lee did not mention these alleged deficits as extant. The Second PIAF stated that Dr. Nang had poor tissue handling, did not apparently know how to hold forceps, could not tie a knot, had difficulty suturing, and could not recognize basic anatomical landmarks during robotic-assisted laparoscopic cases (although Dr. Hu would not let him practice these cases), despite having progressed through his PGY-4 and verbal feedback from other doctors (e.g., Dr. Akhavan) directly telling him to the contrary.  The Second PIAF, among other things, also focused on non-surgical areas too which had been deemed satisfactory at the end of the First PIAF.  The "plan" for the Second PIAF highlighted that he needed to reach certain milestones to progress to PGY-5.  The examples cited were simply copied from the Level 3 categories in the ACGME Urology Milestones, which again are not indicators of performance deficiencies. It also noted that faculty would provide verbal feedback on his surgical skills and technique in real time.

65.    Dr. Lee's portrayal of Dr. Nang as having specific surgical skills well below expectations for a PGY-5 urology resident (or equivalent of a PGY-3) is baseless.  By way of illustration, during his pediatric urology rotation, it was customary practice that on days when multiple pediatric urologists were operating, the Pediatric Chief would be assigned to Dr. Poppas (the Chair of the Pediatric Urology department).  On one of those days when Dr. Nang was the Pediatric Chief, he had been assigned to the operating room with Dr. Poppas. Concurrently, another senior and world-renowned Pediatric Urologist, Dr. Moneer Hanna was involved in a complex case, and Dr. Hanna had been assigned a PGY-2 or PGY-3 to assist him.  As the case proceeded, Dr. Hanna became frustrated and requested that Dr. Nang leave the OR with Dr. Poppas to assist him in the complex surgery. Dr. Nang had to apologize to Dr. Poppas for leaving

prematurely. The case with Dr. Hanna required, among other things, meticulous dissections, hemostasis, and multiple "hand-tied" and "instrument-tied" surgical knots by Dr. Nang. During the surgery Dr. Hanna asked Dr. Nang for (and considered) his suggestions on approaches they could use to complete the surgical repair safely and effectively. After hours intraoperatively, Drs. Hanna and Nang finished the case, and the patient was able to be transferred to the PACU in no distress. When Dr. Nang specifically asked for feedback, Dr. Hanna advised him to continue practicing, but that overall, he was very satisfied with Dr. Nang's surgical skills and stated that he had performed well in the surgery.

66.     Although Dr. Nang had previously asked for accommodation related to his ADHD, on or about May 19, 2023, Dr. Nang provided specific accommodation requests detailed by his treating neuropsychologist/therapist, Dr. Wasserstein, related to his disability.

67.     To address the alleged deficiencies cited in the Second PIAF, Dr. Nang requested (through Dr. Wasserstein) the following reasonable accommodations: (1) dedicated daytime skill building sessions with a preceptor/mentor and assistance with acquiring instruments/sutures/models to practice; (2) extra time for ISE; (3) direct coaching on his surgical technique during surgery; (3) assistance with identification and acquisition of study resources, specifically surgical video didactics and textbooks; (4) extra time for answering questions/low threshold to ask the same questions in different ways during teaching (including intraoperatively); and (5) increased opportunity to practice specific cases that were required under the Second PIAF.

68.     On May 27, 2023, NYP responded via Dr. Lee, in sum and substance, that while Dr. Nang would be afforded additional time for his ISE, he already had been provided with skill building sessions by Drs. Poppas, Li, and Hu, received feedback during surgery, and could not

allow him to practice specific cases because it would compromise patient safety --- essentially ignoring the accommodation requests.

69.     On May 31, 2023, when NYP did not seek to continue with the interactive process regarding Dr. Nang's accommodation requests, Dr. Nang wrote to Dr. Lee to clarify the reasonableness of the accommodation requests, and that such accommodations had not been provided previously. For instance, Dr. Nang explained that the prior skill building sessions all occurred prior to his PGY-5, and most were one-time and of a short duration.  With respect to Dr. Poppas, the "session" added up to less than an hour of instruction.  The robotic simulation training occurred once and was shared with other residents, with an hour assigned for each PGY year.  The microsurgery training with Dr. Li occurred during this PGY-4 research year, again a year before his PIAF.  Also, the only available time for him to complete knot tying and robotic console simulation was either early or late in the day without faculty and at a time least conducive for learning by someone with ADHD. Faculty feedback had also been sparse and inconsistent during his first PIAF, and mostly occurred at rotations away from the Cornell Campus. In terms of formal feedback sessions, during the Second PIAF, they occurred at less than half the frequency described, involved a couple of informal phone calls from Dr. Winkler, and one formal feedback session with Dr. Poppas at the end of the rotation. Dr. Nang detailed that the accommodation being requested was to have a faculty mentor <u>review</u> upcoming cases with him <u>before</u> the cases occur to discuss techniques, anatomy, etc.  In addition, Dr. Nang explained that he was requesting the opportunity to clarify a question with an attending during a surgical case, noting that "[p]eople with ADHD process verbal information differently and need a few seconds more to answer questions. '[L]ow threshold to ask the same questions in different ways' means allow a back and forth to clarify the question, so that there is no misunderstanding about what is being asked, especially as these can

be misconstrued as signifying the resident does not know the answer." Lastly, Dr. Nang expressed that he did not want to extend specific cases which would compromise patient safety, but to increase the volume of time working in the operating room – an accommodation he had asked Dr. Lee for in a phone call on April 24, 2023 while at Brooklyn Methodist. That opportunity also never transpired.

70.    On May 30, 2023, Dr. Nang wrote to Dr. Lee based on NYP's DIO's suggestion, to summarize his desire to continue in the Program in advance of the CCC meeting, again highlighting that the ACGME milestones are simply guidance, and a willingness to extending his academic training with the requested accommodations to progress to PGY-6. As Dr. Nang aptly wrote to Dr. Lee, the interactive process is a two-way street.

71.    Nevertheless, on or about July 19, 2023, NYP informed Dr. Nang that the CCC had convened and decided that it would recommend termination of his employment citing that he had not remedied the technical and surgical skills deficiencies to progress to a chief urology resident, and that it was "unlikely after that [he] will meet the target Urology Milestones for graduation based on [his] foundational deficits in surgical skills."

72.    NYP suggested that unless Dr. Nang was willing to resign from the Program and pursue an alternative field of medicine and/or specialty at NYP, it would terminate his employment effective August 1, 2023.

73.    Dr. Nang declined to resign as doing so would effectively end his career as a urologist. As he noted in his application to NYP, "[a]lthough my life has been a tapestry of contrasts, I managed to find my wings at the tip of a pen, my strength in my voice, and my purpose at the end of a scalpel."

74.     Although subsequent communications through counsel occurred, NYP's position remained unchanged.

75.     On July 24, 2023, NYP formally terminated Dr. Nang's employment and participation in the Program.

76.     Dr. Nang provided NYP with an account of his cognitive impairment and his need for reasonable accommodation in the work environment. As an employer, NYP failed to engage in the required dialogue once Dr. Nang identified his disability and requested reasonable accommodation.  The two PIAFs implemented by NYP were intended to justify an unlawful termination of employment.  As the only Black gay resident in the Program, Dr. Nang was subjected to performance metrics that were not uniformly applied to similarly situated residents under the guise of meeting ACGME milestones, and when he complained that alleged support was lacking to meet such standards, his efforts were rebuffed. Instead, NYP acted in violation of ACGME requirements, terminated Dr. Nang's employment based on his disability under the guise of performance deficiencies, and refused to engage in a good-faith inquiry as to the reasonable accommodations requested as is required by law. NYP rejected Dr. Nang's reasonable accommodation requests, supported and allowed a hostile work environment to exist and perpetuate based on his race and/or color, disability, and sexual orientation, retaliated against him for complaining about disparate treatment, and ultimately terminated his employment despite being eligible to continue in the Program simply because NYP did not want a Black gay resident with a cognitive disability to remain in the Program.

77.     Further, similarly situated non-disabled heterosexual male colleagues were permitted to remain in the Program and promoted to PGY-6, while Dr. Nang was not.

**FIRST CAUSE OF ACTION**
**FOR DISABILITY DISCRIMINATION UNDER**
**THE REHABILITATION ACT OF 1973**

78.     Dr. Nang repeats and realleges the allegations contained in paragraphs "1" through "77" hereof as if fully set forth at length herein.

79.     The acts committed by Defendant, NYP, which are all deemed a part of this cause of action, constitute an unlawful discriminatory practice against Dr. Nang based on his cognitive disability in violation of the Rehabilitation Act of 1973 (29 U.S.C. §701 *et seq.*).

80.     At all relevant times herein, Dr. Nang had a disability and/or was regarded as having a disability by Defendant NYP and therefore is a member of a protected class.

81.     At all relevant times herein, NYP's urology residency program was a program or activity as defined by Section 504 of the Rehabilitation Act of 1973, as amended 29 U.S.C. §794 that received federal financial assistance.

82.     The acts of which Dr. Nang complains of constitute disability discrimination, took place as a result of Dr. Nang's cognitive and/or perceived cognitive disability, and all took place while Dr. Nang was a NYP employee and in the course of his employment at NYP.

83.     The acts and conduct complained of herein supporting Dr. Nang's claims for disability discrimination were committed by NYP personnel who possessed and maintained supervisory authority over Dr. Nang, had the power to make, and made personnel decisions affecting Dr. Nang, and for whose acts NYP is liable.

84.     The acts and conduct complained of herein supporting Dr. Nang's claims for disability discrimination were used as a basis for decisions affecting the terms, conditions, and privileges of his employment, including without limitation exclusion from participation in and

denial of benefits under the NYP residency program, and his ultimate discharge from NYP.

85.    As a direct and proximate result of NYP's conduct, Dr. Nang has suffered and will continue to suffer from, among other things, a significant loss of income, benefits, as well as other losses associated with the effects of NYP's conduct upon his employment, career, and life's normal pursuits, all of which has had and will continue to have an irreparably devastating effect upon the quality of his life and will prevent him from functioning as he did prior to the conduct complained of herein.

86.    NYP's discriminatory conduct so degraded Dr. Nang physically, mentally, and emotionally that, as a proximate result of NYP's violation of his civil rights, Dr. Nang has suffered, and will continue to suffer, among other things, mental and emotional injuries.

87.    As a direct and proximate result of NYP's violation of Dr. Nang's rights under the Rehabilitation Act of 1973, NYP is liable to Dr. Nang for actual damages for loss of wages and benefits and compensatory damages in an amount to be determined at trial.

88.    As a direct and proximate result of NYP's violation of Dr. Nang's rights under the Rehabilitation Act of 1973, NYP is further liable to Dr. Nang for attorney's fees, and other equitable and/or declaratory relief.

89.    Dr. Nang therefore seeks judgment against NYP on this First Cause of Action for actual damages including loss of wages and benefits, compensatory damages in an amount to be determined at trial, plus costs, disbursements, attorney's fees, and declaratory and/or equitable relief, including Dr. Nang's return to his PGY-5 in the NYP urology residency program.

## SECOND CAUSE OF ACTION
## FOR RETALIATION UNDER
## THE REHABILITATION ACT OF 1973

90.     Dr. Nang repeats and realleges the allegations contained in paragraphs "1" through "89" hereof as if fully set forth herein.

91.     The acts committed by NYP, which are all deemed a part of this cause of action, constitute unlawful retaliatory conduct against Dr. Nang in violation of the Rehabilitation Act of 1973.

92.     The acts of which Dr. Nang complains of herein, support his claims for retaliation and took place as a result of and in retaliation for, including but not limited to, Dr. Nang's requesting a reasonable accommodation related to his cognitive disability regarding his continuation in the NYP urology program that ultimately led to his discharge.

93.     At all relevant times hereto, NYP personnel had the power to make, and made, personnel decisions affecting Dr. Nang, and for whose acts NYP is liable.

94.     As a direct and proximate result of NYP's retaliatory conduct, Dr. Nang has suffered and will continue to suffer from, among other things, a significant loss of income benefits as well as other losses associated with the effects of NYP's conduct upon Dr. Nang's employment, career, and life's normal pursuits, all of which has had and will continue to have an irreparably devastating effect upon the quality of his life and will prevent him from functioning as he did prior to the conduct complained of herein.

95.     NYP's retaliatory conduct so degraded Dr. Nang physically, mentally, and emotionally that, as a proximate result of the NYP's violation of his civil rights, Dr. Nang has suffered, and will continue to suffer, among other things, mental and emotional injuries.

96.     As a direct and proximate result of NYP's violation of Dr. Nang's rights under the Rehabilitation Act of 1973, NYP is liable to Dr. Nang for lost income and benefits, and compensatory damages in an amount to be determined at trial.

97.     As a direct and proximate result of NYP's violation of Dr. Nang's rights under the Rehabilitation Act of 1973, NYP is further liable to Dr. Nang for attorney's fees, and other equitable and/or declaratory relief.

98.     Dr. Nang therefore seeks judgment against the NYP on the Second Cause of Action for actual damages including loss of wages and benefits, compensatory damages in an amount to be determined at trial, plus costs and disbursements, attorney's fees and/or equitable relief, including Dr. Nang's return to his PGY-5 in the NYP urology residency program.

### THIRD CAUSE OF ACTION
### FOR RACE DISCRMINATION
### UNDER 42 U.S.C §1981

99.     Dr. Nang repeats and realleges the allegations contained in paragraphs "1" through "98" hereof as if fully set forth at length herein.

100.    The acts committed by Defendants as set forth at length in paragraphs "1" through "98" of this Complaint, which are all deemed a part of this cause of action, constitute an unlawful discriminatory practice against Dr. Nang based on his color and/or race for violating his rights under 42 U.S.C. §1981.

101.    The acts of which Dr. Nang complains constitute race and/or color discrimination, took place as a result of Dr. Nang's membership in a protected class, and all took place while he was a NYP employee and in the course of his employment at NYP.

102.    The acts and conduct complained of herein supporting Dr. Nang's claims for discrimination, include but are not limited to, demeaning and derogatory comments towards him

based on his race and/or color and a failure to progress Dr. Nang beyond his PGY-5 based on his race and/or color. Such acts and conduct were committed by NYP's supervisory personnel, who possessed and maintained direct supervisory authority over Dr. Nang.

103. The acts and conduct complained of herein supporting Dr. Nang's claims for discrimination were used as a basis for decisions affecting the terms, conditions, and privileges of his employment.

104. As a direct and proximate result of NYP's conduct, Dr. Nang has suffered and will continue to suffer from, among other things, a significant and material loss of income, benefits, as well as other losses associated with the effects of NYP's conduct upon his employment, career, and life's normal pursuits, all of which has had and will continue to have an irreparably devastating effect upon the quality of his life and will prevent him from functioning as he did prior to the conduct complained of herein.

105. NYP's discriminatory conduct has so degraded Dr. Nang physically, mentally, and emotionally that, as a proximate result of NYP's violation of his civil rights, Dr. Nang has suffered, and will continue to suffer, among other things, mental and emotional injuries.

106. Further, NYP's discriminatory practices were done with malice and/or reckless indifference to Dr. Nang's protected rights, such that, in addition to all the measures of relief cited herein to which Dr. Nang is entitled, NYP should be required to pay punitive damages as punishment for its vile, indecent, and reprehensible conduct, in order to deter NYP and others similarly situated from such conduct in the future.

107. As a direct and proximate result of NYP's violation of Dr. Nang's rights under 42 U.S.C. §1981, for actual damages for back pay and front pay, compensatory damages, and punitive damages in an amount to be determined at trial.

108.    As a direct and proximate result of NYP's violation of Dr. Nang's rights under 42 U.S.C. §1981, for equitable and/or declaratory relief, including prospective injunctive relief, and attorney's fees pursuant to pursuant to 42 U.S.C. §1988.

109.    Dr. Nang therefore seeks judgment against NYP on this Third Cause of Action for actual damages including back pay and front pay, compensatory damages, and punitive damages in an amount to be determined at trial, plus costs, disbursements, and attorney's fees, and declaratory and/or equitable relief.

**FOURTH CAUSE OF ACTION
FOR DISABLITY DISCRIMINATION UNDER THE
<u>NEW YORK EXECUTIVE LAW</u>**

110.    Dr. Nang repeats and realleges the allegations contained in paragraphs "1" through "109" hereof as if fully set forth at length herein.

111.    The acts committed by NYP, which are all deemed a part of this cause of action, constitute an unlawful discriminatory practice against Dr. Nang based on his cognitive disability in violation of NYSHRL §296(1)(a) and §296(6).

112.    At all relevant times herein, Dr. Nang had a disability and/or was regarded as having a disability by NYP and therefore is a member of a protected class.

113.    The acts which Dr. Nang complains of herein supporting his claims for disability discrimination took place as a result of his membership in a protected class and all took place while he was a NYP employee of and in the course of his NYP employment.

114.    The acts and conduct complained of herein supporting Dr. Nang's claims for disability discrimination were committed by NYP personnel who possessed and maintained direct supervisory authority over Dr. Nang, had the power to make, and made, personnel decisions affecting Dr. Nang, and for whose acts NYP is liable.

115.    The acts and conduct complained of herein supporting Dr. Nang's claims for disability discrimination were used as a basis for decisions affecting the terms, conditions, and privileges of Dr. Nang's employment, including without limitation his ultimate discharge from NYP.

116.    As a direct and proximate result of NYP's conduct, Dr. Nang has suffered and will continue to suffer from, among other things, a significant loss of income, benefits, as well as other losses associated with the effects of NYP's conduct upon Dr. Nang's employment, career, and life's normal pursuits, all of which has had and will continue to have an irreparably devastating effect upon the quality of his life and will prevent him from functioning as he did prior to the conduct complained of herein.

117.    NYP's discriminatory conduct so degraded Dr. Nang physically, mentally, and emotionally that, as a proximate result of the violation of his civil rights, Dr. Nang has suffered, and will continue to suffer, among other things, mental and emotional injuries, plus attorney's fees.

118.    As a direct and proximate result of NYP's violation of Nang's rights under the NYSHRL, NYP is liable to Dr. Nang for lost income and benefits, compensatory damages pursuant to NYSHRL §297(4)(c)(iii), and punitive damages pursuant to NYSHRL §297(4)(c)(iv) in an amount to be determined at trial.

119.    Dr. Nang therefore seeks judgment against NYP on the Fourth Cause of Action for actual damages including loss of wages and benefits, compensatory damages and punitive damages in an amount to be determined at trial, plus attorney's fees, costs, and disbursements.

120.    Dr. Nang also seeks the imposition of the maximum civil fines and penalties against NYP pursuant to §297(4)(c)(vi) of the NYSHRL for its willful, wanton, and malicious conduct.

**FIFTH CAUSE OF ACTION**
**FOR RETALIATION UNDER THE**
**NEW YORK EXECUTIVE LAW**

121.    Dr. Nang repeats and realleges the allegations contained in paragraphs "1" through "120" hereof as if fully set forth herein.

122.    The acts committed by NYP, which are all deemed a part of this cause of action, constitute unlawful retaliatory conduct against Dr. Nang in violation of NYSHRL §296(6) and §296(7).

123.    The acts which Dr. Nang complains of herein, support his claims for retaliation and took place as a result of and in retaliation for, including but not limited to, Dr. Nang's requesting a reasonable accommodation related to his cognitive disability regarding his continuation in the NYP urology program that ultimately led to his discharge.

124.    As a direct and proximate result of NYP's retaliatory conduct, Dr. Nang has suffered and will continue to suffer from, among other things, a significant loss of income benefits as well as other losses associated with the effects of NYP's conduct upon Dr. Nang's employment, career, and life's normal pursuits, all of which has had and will continue to have an irreparably devastating effect upon the quality of his life and will prevent him from functioning as he did prior to the conduct complained of herein.

125.    NYP's retaliatory conduct so degraded Dr. Nang physically, mentally, and emotionally that, as a proximate result of NYP's violation of his civil rights, Dr. Nang has suffered, and will continue to suffer, among other things, mental and emotional injuries.

126.    As a direct and proximate result of NYP's violation of Dr. Nang's rights under the NYSHRL, NYP is liable to Dr. Nang for lost income and benefits, and compensatory damages pursuant to NYSHRL §297(4)(c)(iii) and punitive damages pursuant to NYSHRL §297(4)(c)(iv)

in an amount to be determined at trial, plus attorney's fees.

127.    Dr. Nang therefore seeks judgment against NYP on the Fifth Cause of Action for actual damages including loss of wages and benefits, compensatory damages in an amount to be determined at trial, plus attorney's fees, costs and disbursements.

128.    Dr. Nang also seeks the imposition of the maximum civil fines and penalties against NYP pursuant to §297(4)(c)(vi) of the NYSHRL for their willful, wanton, and malicious conduct.

## SIXTH CAUSE OF ACTION
## FOR SEXUAL ORIENTATION DISCRIMINATION UNDER THE
## NEW YORK EXECUTIVE LAW

129.    Dr. Nang repeats and realleges the allegations contained in paragraphs "1" through "128" hereof as if fully set forth at length herein.

130.    The acts committed by NYP, which are all deemed a part of this cause of action, constitute an unlawful discriminatory practice against Dr. Nang based on his sexual orientation in violation of NYSHRL §296(1)(a) and §296(6).

131.    At all relevant times herein, Dr. Nang was a gay man and therefore is a member of a protected class.

132.    The acts which Dr. Nang complains of herein supporting his claims for sexual orientation discrimination took place as a result of his membership in a protected class and all took place while he was a NYP employee of and in the course of his NYP employment.

133.    The acts and conduct complained of herein supporting Dr. Nang's claims for sexual orientation discrimination were committed by NYP personnel who possessed and maintained direct supervisory authority over Dr. Nang, had the power to make, and made, personnel decisions affecting Dr. Nang, and for whose acts NYP is liable.

134.     The acts and conduct complained of herein supporting Dr. Nang's claims for sexual orientation discrimination were used as a basis for decisions affecting the terms, conditions, and privileges of Dr. Nang's employment, including without limitation his ultimate discharge from NYP.

135.     As a direct and proximate result of NYP's conduct, Dr. Nang has suffered and will continue to suffer from, among other things, a significant loss of income, benefits, as well as other losses associated with the effects of NYP's conduct upon Dr. Nang's employment, career, and life's normal pursuits, all of which has had and will continue to have an irreparably devastating effect upon the quality of his life and will prevent him from functioning as he did prior to the conduct complained of herein.

136.     NYP's discriminatory conduct so degraded Dr. Nang physically, mentally, and emotionally that, as a proximate result of the violation of his civil rights, Dr. Nang has suffered, and will continue to suffer, among other things, mental and emotional injuries.

137.     As a direct and proximate result of NYP's violation of Nang's rights under the NYSHRL, NYP is liable to Dr. Nang for lost income and benefits, compensatory damages pursuant to NYSHRL §297(4)(c)(iii), and punitive damages pursuant to NYSHRL §297(4)(c)(iv) in an amount to be determined at trial, plus attorney's fees.

138.     Dr. Nang therefore seeks judgment against NYP on the Sixth Cause of Action for actual damages including loss of wages and benefits, compensatory damages, and punitive damages in an amount to be determined at trial, plus attorney's fees, costs and disbursements.

139.     Dr. Nang also seeks the imposition of the maximum civil fines and penalties against NYP pursuant to §297(4)(c)(vi) of the NYSHRL for their willful, wanton, and malicious conduct.

## SEVENTH CAUSE OF ACTION
## FOR RACE AND/OR COLOR DISCRIMINATION UNDER THE
## NEW YORK EXECUTIVE LAW

140.    Dr. Nang repeats and realleges the allegations contained in paragraphs "1" through "139" hereof as if fully set forth at length herein.

141.    The acts committed by NYP, which are all deemed a part of this cause of action, constitute an unlawful discriminatory practice against Dr. Nang based on his race and/or color in violation of NYSHRL §296(1)(a) and §296(6).

142.    At all relevant times herein, Dr. Nang was a Black African man and therefore is a member of a protected class.

143.    The acts which Dr. Nang complains of herein supporting his claims for race and/or color discrimination took place as a result of his membership in a protected class, and all took place while he was a NYP employee of and in the course of his NYP employment.

144.    The acts and conduct complained of herein supporting Dr. Nang's claims for race and/or color discrimination were committed by NYP personnel who possessed and maintained direct supervisory authority over Dr. Nang, had the power to make, and made, personnel decisions affecting Dr. Nang, and for whose acts NYP is liable.

145.    The acts and conduct complained of herein supporting Dr. Nang's claims for race and/or color discrimination were used as a basis for decisions affecting the terms, conditions, and privileges of Dr. Nang's employment, including without limitation his ultimate discharge from NYP.

146.    As a direct and proximate result of NYP's conduct, Dr. Nang has suffered and will continue to suffer from, among other things, a significant loss of income, benefits, as well as other losses associated with the effects of NYP's conduct upon Dr. Nang's employment, career, and

life's normal pursuits, all of which has had and will continue to have an irreparably devastating effect upon the quality of his life and will prevent him from functioning as he did prior to the conduct complained of herein.

147.    NYP's discriminatory conduct so degraded Dr. Nang physically, mentally, and emotionally that, as a proximate result of the violation of his civil rights, Dr. Nang has suffered, and will continue to suffer, among other things, mental and emotional injuries.

148.    As a direct and proximate result of NYP's violation of Nang's rights under the NYSHRL, NYP is liable to Dr. Nang for lost income and benefits, compensatory damages pursuant to NYSHRL §297(4)(c)(iii), and punitive damages pursuant to NYSHRL§297(4)(c)(iv) in an amount to be determined at trial, plus attorney's fees.

149.    Dr. Nang therefore seeks judgment against NYP on the Seventh Cause of Action for actual damages including loss of wages and benefits, compensatory damages, and punitive damages in an amount to be determined at trial, plus attorney's fees, costs, and disbursements.

150.    Dr. Nang also seeks the imposition of the maximum civil fines and penalties against NYP pursuant to §297(4)(c)(vi) of the NYSHRL for its willful, wanton, and malicious conduct.

## EIGHTH CAUSE OF ACTION
## FOR DISABILITY DISCRIMINATION UNDER THE
## NEW YORK CITY ADMINISTRATIVE CODE

151.    Dr. Nang repeats and realleges the allegations contained in paragraphs "1" through "150" hereof as if fully set forth herein.

152.    The acts committed by NYP, which are all deemed a part of this cause of action, constitute an unlawful discriminatory practice against Dr. Nang based on his cognitive disability in violation of NYCHRL § 8-107 *et seq*.

153.    At all relevant times herein, Dr. Nang had a disability and/or was regarded as

having a disability by NYP and therefore is a member of a protected class.

154.    The acts which Dr. Nang complains of constitute disability discrimination, took place as a result of Dr. Nang's membership in a protected class, and all took place while he was a NYP employee and in the course of his employment at NYP.

155.    The acts and conduct complained of herein supporting Dr. Nang's claims for disability discrimination were committed by NYP personnel who possessed and maintained supervisory authority over Dr. Nang, had the power to make, and made, personnel decisions affecting Dr. Nang, and for whose acts NYP is liable.

156.    The acts and conduct complained of herein supporting Dr. Nang's claims for disability discrimination were used as a basis for decisions affecting the terms, conditions, and privileges of his employment, including without limitation his ultimate discharge from NYP.

157.    As a direct and proximate result of NYP's conduct, Dr. Nang has suffered and will continue to suffer from, among other things, a significant loss of income, benefits, as well as other losses associated with the effects of NYP's conduct upon his employment, career, and life's normal pursuits, all of which has had and will continue to have an irreparably devastating effect upon the quality of his life and will prevent him from functioning as he did prior to the conduct complained of herein.

158.    NYP's discriminatory conduct so degraded Dr. Nang physically, mentally, and emotionally that, as a proximate result of NYP's violation of his civil rights, Dr. Nang has suffered, and will continue to suffer, among other things, mental and emotional injuries.

159.    Further, NYP's discriminatory practices were done with malice and/or reckless indifference to Dr. Nang's protected rights, such that, in addition to all the measures of relief cited herein to which Dr. Nang is entitled, NYP should be required to pay punitive damages pursuant to

NYCHRL §8-502(a) as punishment for its vile, indecent, and reprehensible conduct, in order to deter NYP and others similarly-situated from such conduct in the future.

160.    As a direct and proximate result of NYP's violation of Dr. Nang's rights under the NYCHRL, NYP is liable to Dr. Nang for actual damages for loss of wages and benefits, and compensatory and punitive damages in an amount to be determined at trial.

161.    As a direct and proximate result of NYP's violation of Dr. Nang's rights under the NYCHRL, NYP is further liable to Dr. Nang for attorney's fees pursuant to NYCHRL §8-502(g).

162.    Dr. Nang therefore seeks judgment against NYP on the Eighth Cause of Action for actual damages for loss of wages and benefits, compensatory damages, and punitive damages in amount to be determined at trial, plus costs, disbursements, and attorney's fees.

## NINTH CAUSE OF ACTION
## FOR RETALIATION UNDER THE
## NEW YORK CITY ADMINISTRATIVE CODE

163.    Dr. Nang repeats and realleges the allegations contained in paragraphs "1" through "162" hereof as if fully set forth herein.

164.    The acts committed by NYP, which are all deemed a part of this cause of action, constitute unlawful and retaliatory conduct against Dr. Nang in violation of his rights under the NYCHRL §8-107(7).

165.    The acts which Dr. Nang complains of herein supporting his claim of retaliation took place as a result of and in retaliation for, including but not limited to, Dr. Nang seeking a reasonable accommodation for his cognitive disability.

166.    As a direct and proximate result of NYP's retaliatory conduct, Dr. Nang suffered and will continue to suffer from, among other things, a significant loss of income, benefits, as well as other losses associated with the effects of NYP's conduct upon Dr. Nang's employment, career,

and life's normal pursuits, all of which has had and will continue to have an irreparably devastating effect upon the quality of his life and will prevent him from functioning as he did prior to the conduct complained of herein.

167.    NYP's conduct so degraded Nang physically, mentally, and emotionally that, as a proximate result of NYP's violation of his civil rights, Dr. Nang has suffered, and will continue to suffer, among other things, mental and emotional injuries.

168.    Further, the acts committed by NYP  were done with malice and/or reckless indifference to Dr. Nang's protected rights, such that, in addition to all the measures of relief complained of herein to which Dr. Nang is entitled, NYP should be required to pay punitive damages pursuant to NYCHRL §8-502(a) as punishment for their vile, indecent, and reprehensible conduct, in order to deter NYP and others similarly situated from such conduct in the future.

169.    As a direct and proximate result of NYP's violation of Dr. Nang's rights under the NYCHRL, NYP is liable to Dr. Nang for lost wages and benefits, and compensatory and punitive damages an amount to be determined at trial.

170.    As a direct and proximate result of NYP's violation of Dr. Nang's rights under the NYCHRL, NYP is further liable to Dr. Nang for attorney's fees pursuant to NYCHRL §8-502(g).

171.    Dr. Nang therefore seeks judgment against NYP on the Ninth Cause of Action for actual damages for loss of wages and benefits, compensatory and punitive damages in an amount to be determined at trial, plus costs, disbursements, and attorney's fees.

## TENTH CAUSE OF ACTION
## FOR SEXUAL ORIENTATION DISCRIMINATION UNDER THE
## NEW YORK CITY ADMINISTRATIVE CODE

172.    Dr. Nang repeats and realleges the allegations contained in paragraphs "1" through "171" hereof as if fully set forth herein.

173.    The acts committed by NYP, which are all deemed a part of this cause of action, constitute an unlawful discriminatory practice against Dr. Nang based on his sexual orientation in violation of the NYCHRL § 8-107 *et seq*.

174.    Dr. Nang, a gay man, is a member of a protected class.

175.    The acts of which Dr. Nang complains constitute sexual orientation discrimination, took place as a result of Dr. Nang's membership in a protected class, and all took place while he was a NYP employee and in the course of his employment at NYP.

176.    The acts and conduct complained of herein supporting Dr. Nang's claims for sexual orientation discrimination were committed by NYP personnel who possessed and maintained supervisory authority over Dr. Nang, had the power to make, and made, personnel decisions affecting Dr. Nang, and for whose acts NYP is liable.

177.    The acts and conduct complained of herein supporting Dr. Nang's claims for sexual orientation discrimination were used as a basis for decisions affecting the terms, conditions, and privileges of his employment, including without limitation his ultimate discharge from NYP.

178.    As a direct and proximate result of NYP's conduct, Dr. Nang has suffered and will continue to suffer from, among other things, a significant loss of income, benefits, as well as other losses associated with the effects of NYP's conduct upon his employment, career, and life's normal pursuits, all of which has had and will continue to have an irreparably devastating effect upon the quality of his life and will prevent him from functioning as he did prior to the conduct complained of herein.

179.    NYP's discriminatory conduct so degraded Dr. Nang physically, mentally, and emotionally that, as a proximate result of NYP's violation of his civil rights, Dr. Nang has suffered, and will continue to suffer, among other things, mental and emotional injuries.

180.    Further, NYP's discriminatory practices were done with malice and/or reckless indifference to Dr. Nang's protected rights, such that, in addition to all the measures of relief cited herein to which Dr. Nang is entitled, NYP should be required to pay punitive damages pursuant to NYCHRL§8-502(a) as punishment for its vile, indecent, and reprehensible conduct, in order to deter NYP and others similarly-situated from such conduct in the future.

181.    As a direct and proximate result of NYP's violation of Dr. Nang's rights under the NYCHRL, NYP is liable to Dr. Nang for actual damages for loss of wages and benefits, and compensatory and punitive damages in an amount to be determined at trial.

182.    As a direct and proximate result of NYP's violation of Dr. Nang's rights under the NYCHRL, NYP is further liable to Nang for attorney's fees pursuant to NYCHRL §8-502(g).

183.    Dr. Nang therefore seeks judgment against NYP on this Tenth Cause of Action for actual damages for loss of wages and benefits, compensatory damages, and punitive damages in amount to be determined at trial, plus costs, disbursements, and attorney's fees.

## ELEVENTH CAUSE OF ACTION
## FOR RACE AND/OR COLOR DISCRIMINATION UNDER THE
## NEW YORK CITY ADMINISTRATIVE CODE

184.    Dr. Nang repeats and realleges the allegations contained in paragraphs "1" through "183" hereof as if fully set forth herein.

185.    The acts committed by NYP, which are all deemed a part of this cause of action, constitute an unlawful discriminatory practice against Dr. Nang based on his color and/or race in violation of the NYCHRL § 8-107 *et seq.*

186.    Dr. Nang, a Black African man, is a member of a protected class.

187.    The acts of which Dr. Nang complains of constitute race and/or color

discrimination, took place as a result of Dr. Nang's membership in a protected class, and all took place while he was a NYP employee and in the course of his employment at NYP.

188. The acts and conduct complained of herein supporting Dr. Nang's claims for race and/or color discrimination were committed by NYP personnel who possessed and maintained supervisory authority over Dr. Nang, had the power to make, and made, personnel decisions affecting Dr. Nang, and for whose acts NYP is liable.

189. The acts and conduct complained of herein supporting Dr. Nang's claims for color and/or race discrimination were used as a basis for decisions affecting the terms, conditions, and privileges of his employment, including without limitation his ultimate discharge from NYP.

190. As a direct and proximate result of NYP's conduct, Dr. Nang has suffered and will continue to suffer from, among other things, a significant loss of income, benefits, as well as other losses associated with the effects of NYP's conduct upon his employment, career, and life's normal pursuits, all of which has had and will continue to have an irreparably devastating effect upon the quality of his life and will prevent him from functioning as he did prior to the conduct complained of herein.

191. NYP's discriminatory conduct so degraded Dr. Nang physically, mentally, and emotionally that, as a proximate result of NYP's violation of his civil rights, Dr. Nang has suffered, and will continue to suffer, among other things, mental and emotional injuries.

192. Further, NYP's discriminatory practices were done with malice and/or reckless indifference to Dr. Nang's protected rights, such that, in addition to all the measures of relief cited herein to which Dr. Nang is entitled, NYP should be required to pay punitive damages pursuant to NYCHRL§8-502(a) as punishment for its vile, indecent, and reprehensible conduct, in order to deter NYP and others similarly-situated from such conduct in the future.

193. As a direct and proximate result of NYP's violation of Dr. Nang's rights under the NYCHRL, NYP is liable to Dr. Nang for actual damages for loss of wages and benefits, and compensatory and punitive damages in an amount to be determined at trial.

194. As a direct and proximate result of NYP's violation of Dr. Nang's rights under the NYCHRL, NYP is further liable to Nang for attorney's fees pursuant to NYCHRL §8-502(g).

195. Dr. Nang therefore seeks judgment against NYP on this Eleventh Cause of Action for actual damages for loss of wages and benefits, compensatory damages, and punitive damages in amount to be determined at trial, plus costs, disbursements, and attorney's fees.

**WHEREFORE**, Dr. Nang demands judgment against Defendants, individually, jointly, and severally as follows: (i) on the First Cause of Action for actual damages, including loss of wages and benefits, compensatory damages in an amount to be determined at trial, plus costs, disbursements, attorney's fees, and other equitable and/or declaratory relief; (ii) on the Second Cause of Action for actual damages, including loss of wages and benefits, compensatory damages in an amount to be determined at trial, plus costs, disbursements, attorney's fees, and other equitable and/or declaratory relief; (iii) on this Third Cause of Action for actual damages including back pay and front pay, compensatory damages, and punitive damages in an amount to be determined at trial, plus costs, disbursements, and attorney's fees, and declaratory and/or equitable relief; (iv) on the Fourth Cause of Action for actual damages, including loss of wages and benefits, compensatory and punitive damages in an amount to be determined at trial, plus attorney's fees, costs, disbursements; (v) on the Fifth Cause of Action for actual damages, including loss of wages and benefits, compensatory and punitive damages in an amount to be determined at trial, plus attorney's fees, costs and disbursements; (vi) on the Sixth Cause of Action for actual damages,

including loss of wages and benefits, compensatory and punitive damages in amount to be determined at trial, plus attorney's fees, costs and disbursements; (vii) on the Seventh Cause of Action for actual damages, including loss of wages and benefits, compensatory damages and punitive damages in an amount to be determined at trial, plus attorney's fees, costs and disbursements; (viii) on the Eighth Cause of Action for actual damages, including loss of wages and benefits, compensatory damages in an amount to be determined at trial, plus costs and disbursements (ix) on the Ninth Cause of Action for actual damages, including loss of wages and benefits, compensatory damages and punitive damages in an amount to be determined at trial, plus costs, disbursements, and attorney's fees; (x) on the Tenth Cause of Action for actual damages, including loss of wages and benefits, compensatory damages and punitive damages in an amount to be determined at trial, plus costs, disbursements, and attorney's fees; (xi) on the Eleventh Cause of Action for actual damages, including loss of wages and benefits, compensatory damages and punitive damages in an amount to be determined at trial, plus costs, disbursements, and attorney's fees; and (xii) for such other and further relief as this Court deems just and proper.

Dated:   Mount Kisco, New York
         June 7, 2024

                              MARKUS & SHERIDAN, LLP

                    By:   _____/s/_____
                              Marc O. Sheridan
                              *Attorneys for Plaintiff*
                              118 North Bedford Road, Suite 305
                              Mount Kisco, New York 10549
                              (914) 241-6300